UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X        09-CV-5057 (RMB)(GWG)

MURRAY S. ALEXANDER,                                :
                                                   :
                        Plaintiff,                 :
                                                   :
                -against-                          :
                                                   :
UNIMAC GRAPHICS and BIND-RITE-                     :
UNION GRAPHICS, LLC.                               :
                                                   :
                        Defendants.                :
-----------------------------------------------------X


PLAINTIFF MURRAY S. ALEXANDER'S
POST TRIAL MEMORANDUM OF LAW
<u>CONCERNING LIABILITY</u>

**Alexander v. Unimac Graphics-Plaintiff's Post-Trial Brief**

After three days of trial, the testimony of four witnesses and the receipt into evidence of sixty documentary exhibits, one thing is abundantly clear-Defendant Unimac Graphics ("Unimac" and/or "Defendant") has failed to pay Plaintiff Murray S. Alexander ("Alexander" and/or "Plaintiff") all of his earned sales commissions in violation of the New York Labor Law's Article 6, Section 190, et seq. ("NYLL").

**Evidentiary Facts**

**Unimac Graphics**

Unimac is a commercial and part packaging printing company.  Tr. July 11, 2011, 15:12-13.[1]  Unimac was a merger of Union Graphics and McNaughton in 1998.  *Id*. at 15:15-16. George Amann ("Amann") is the President/CEO of Unimac.  *Id*. at 14:13-14.  In 2005 Unimac generated revenues between $55 and $60 million dollars, in 2006 and 2007 Unimac's revenues ranged between $60 and $65 million dollars.  *Id*. at 17:4-11; 17-19; and, 18:2-4.  Between 2005 and 2007 Unimac was "running, approximately, five percent profit, net after taxes."  *Id*. at 17:12-24.

**Alexander's Career in Printing Sales Industry**

Alexander has been employed in printing sales since he graduated college in 1977.  *Id*. at 339:18-20.  Alexander's first job in printing was with Royal Paper as a sales trainee at a salary of $175.00 per week.  *Id*. at 339:24-340:8.  After about two years at Royal Paper, Alexander was employed as a sales trainee at the Andrews Nelson Whitehead division of Boise Cascade where he was compensated by a salary of $235.00 per week.  *Id*. at 340:14-341:4.

---

[1] "Tr." refers to the trial transcript, followed by the page and line numbers of the transcript.

Alexander's third job in printing sales was as a salesman with the Forest Paper Company and he was paid a weekly salary of $500.00 plus commissions. _Id_. at 341:11-23. While employed at Forest Paper, Alexander's salary was paid separately from his sales commissions and he received a commission sheet along with his commission checks. _Id_. at 342:9-17. Alexander was able to verify that the commission payments he received at Forest Paper were accurate because "[i]t was a time when paper was very, very tough and for the most part I had to find my own paper to sell it, so I knew the purchase price and I knew the selling price." _Id_. at 342:18-22.

Following Forest Paper, Alexander was employed as a salesman at Saxon Paper Product ("Saxon") and was compensated by a "draw versus commission." _Id_. at 342:25-343:10. Alexander understood a draw versus commission to mean "you would receive a compensation check of some small amount every week and then you had a job you would pay back whatever you've advanced and try to wipe the slate clean, try and stay ahead so you'd earn more money." _Id_. at 343:11-16. Alexander received commission statements while employed at Saxon and those statements contained "[e]very detail of the job." _Id_. at 344:1-9. Alexander never disputed a commission while employed at Forest Paper or Saxon. _Id_. at 344:10-15. Saxon filed for bankruptcy, Alexander went back to Royal Paper as a salesman and was compensated by a salary of around $40,000.00. _Id_. at 344:18-345:3.

Alexander then took a job as a printing sales manager at Ebasco Services and was paid a salary of $25,000.00 per year. _Id_. at 345:9-18. Alexander managed a salesman while at Ebasco Services who was also compensated by a salary. _Id_. at 346:8-11. After Ebasco Services Alexander was employed as a printing salesman by Triple A International Printing Company ("Triple 'A'") and received a salary of $35,000.00 per year. _Id_. at 346:14-25.

3

Subsequent to Triple 'A' Alexander started his own company, GML, which was a printing brokerage that he was president of. *Id*. at 347:3-19.  At GML, Alexander employed about five salespeople and some of them received salaries, some of them received draw versus commission and some of them received only commissions. *Id*. at 348:2-11.  Alexander, after the first year at GML, received commission payments. *Id*. at 348:12-17.  At GML commissions were calculated by "tak[ing] the cost of the goods used in production and…mark it up.  We were trying the average was between 30 and 40 percent and we split it 50/50, house versus salesperson." *Id*. at 348:22-349:2.  The motto at GML was "partners in profit and loss." *Id*. at 349:8-9.  To demonstrate to the salesman at GML that their commissions were being calculated properly, Alexander provided them with "monthly sales reports" containing a "cost sheet of what each item costs and what we paid for it", the sales sheet contained "[t]he actual costs, what we actually bought it for." *Id*. at 351:6-22.

GML later merged with Darbert Offset ("Darbert") with Alexander as Executive Vice President-Sales, and a new entity named Rainbow Color Imaging ("Rainbow") was formed with Alexander as President. *Id*. at 349:22-350:4; 352:6-7, 18-21.  Alexander was employed simultaneously by Darbert and Rainbow, selling printing through Darbert while running Rainbow.  Alexander was paid a commission of 50/50 minus 15% of the cost at Darbert and a salary of around $100,000.00 at Rainbow. *Id*. at 350:10-351:5; 352:3-5.  Alexander was able to verify that his sales commissions at Darbert were accurately calculated by "[b]inder the cost of every job going in but if there was something I had a question about I wanted to see an invoice, you'd walk into accounting and open a drawer." *Id*. at 353:13-17.  Eventually, in 1997 Alexander gave up Rainbow and went from Executive Vice President-Sales to CEO of Darbert. *Id*. at 352:18-21; 353:18-22.  Alexander stepped down as CEO of Darbert but continued to sell

printing jobs for Darbert while free-lancing.  *Id*. at 355:1-8.  While free-lancing for Darbert Alexander was compensated under the same commission structure and was able to determine that his commission payments were calculated properly because "I would get a statement of cost and paper and all the information I needed to figure a job's cost were provided monthly."  *Id*. at 356:20-24, 357:6-13.

Around 2001, at the coaxing of his clients, Alexander began employment at Applied Printing Technologies ("APT").  *Id*. at 355:5-25.  At ATP Alexander was Vice President of Sales, compensated for the first month on a salary and thereafter a straight commission.  *Id*. at 359:19-23.  Alexander's commission at APT was 50 percent of the profit on sheet fed jobs and 45 percent on web jobs plus expenses.  *Id*. at 360:3-5.  Alexander was able to determine that his commission payments at APT were accurate because he had access to the "full bookkeeping system" and could use his computer to "actually monitor the work flow of the job from anywhere."  *Id*. at 360:10-23.  When a job at APT was ready to bill, Alexander would receive a work up sheet of "all the costs," "the one that came in the sheet were actual costs."  *Id*. at 361:23-362:10.  "The actual cost was always used in calculating commission."  *Id*. at 364:1-4. During Alexander's testimony, the following exchange occurred:

> The Court:       "And you would figure out that price based on an estimated cost that you'd done?"
>
> The Witness:   "Correct."
>
> The Court:       "So is what you are saying that when it came to do your commission that estimated cost was not used and actual cost was used?"
>
> The Witness:   "That's right.  And sometimes you ended up with less money because it cost more to produce the job than the estimate or anticipated."

The Court:       "Would you end up with more money?"

The Witness:   "Most of the time you ended with more."

*Id*. at 364:13-23.

Actual costs included labor, which meant someone was keeping track of individual labor hours on a job, using either touch screen, card swipe, or fingerprint systems that were also used to identify who was working the press so that "everything is critically calculated or else they would never know their bottom line at the end of the year." *Id*. at 365:8-25.

Alexander was employed at APT for about two years, selling jobs to about half a dozen customers. *Id*. at 366:9-13. Three of Alexander's big clients while at APT were Gray Advertising, McCann Ericson ("McCann"), and Wunderman. *Id*. at 366:14-17. Alexander's sales during his second year at APT were about $3,500,000.00. *Id*. at 367:3-7. Rumors began circulating at APT that it was going to be acquired by Earth Color, and Alexander was not interested in working for Earth Color. *Id*. at 367:12-17.

During a lunch with his client, John from Wunderman, Alexander asked if Wunderman was doing business with Unimac and learned that they were not. John told Alexander that if he went to Unimac that Wunderman would use Alexander and Unimac if they could. *Id*. at 367:19-25. Alexander also met with Nancy Luciani and Lou Arceo from McCann and inquired whether he would be able to sell jobs to McCann's client Verizon. After some discussions, and with guarantees that Alexander would be working with production manager John McMurray, McCann would follow Alexander from APT to Unimac. *Id*. at 368:1-18.

### Unimac's Search for a Salesman and Pre-employment Discussions with Alexander

Amann was looking for additional salespeople and Alexander was recommended to Amann by someone at Applied Printing. *Id*. at 19:12-17. Alexander was looking to join a

company where he could keep selling jobs to McCann and Wunderman, where there was

vacancy and no salesman at the company had existing business with McCann and Wunderman.

*Id*. at 378:4-11.  Alexander began discussing potential employment at Unimac with Amann

around October 2004.  *Id*. at 377:19-378:3.  Amann wanted Alexander to handle the McCann and

Wunderman accounts.  *Id*. at 28:1-13.  While discussing potential employment at Unimac with

Alexander, Amann "was telling me he would cover my expenses the first year.  I had a

guaranteed salary.  I would work off the commission list, the commission schedule he provided.

Our production person would be John McMurray."  *Id*. at 378:12-17.  With respect to Unimac's

estimating department Alexander was told that "all estimates would be - - if it was internal cost

they had a very elaborate costing system, and external would be based on cost of the, for the

vendor, the quote to do the job."  Amann also told Alexander that "all estimates would be based

on cost."  *Id*. at 389:10-390:6.

## The Employment Memorandum

Amann authored a memorandum (Ex. A1 and A2[2]) setting forth some of the terms and

conditions of Alexander's employment at Unimac.  *Id*. at 25:24-26:5.  Alexander testified that

when he received the memorandum from Amann he formed the belief that he was going to

receive a salary during his employment at Unimac "[b]ecause it says in A that I would get- - [i]t

says in A that I would receive a draw guaranteed of 75,000 initially, and then G says after 60

days sales over draw would be paid by commission check, and I took it for its word."  *Id*. at

380:9-18.  Alexander testified that his understanding of paragraph G of the employment

memorandum, particularly the phrase "sales over draw", meant "draw was a guarantee and then

---

[2] "Ex." Refers to exhibits received into evidence at trial, Plaintiff's exhibits will be referenced by numbers,
Defendant's exhibits will be referenced by letters.

sales, anything I brought in after that would be additional." *Id*. at 380:19-23.  Attached to the employment memorandum was a copy of Unimac's Mark Up And Commission Structure, which was authored by Amann.  *Id*. at 42:2-21; 381:7-9; 47:5-7.

### Unimac's Mark Up And Commission Structure

Unimac's Mark Up And Commission Structure ("commission structure") provides a table with a range of mark ups and a correlating commission percentage based upon the mark up.  Ex. 3; Tr. 43:15-44:2.  The commission structure states, inter alia, "[l]abor is at cost – outside materials and purchases are marked up", and continues "[a]ll costs must be included- car services, messengers, shipping, labeling, etc and marked up."  Just below the table and the two provisions cited above the commission structure states "[s]alesperson will be paid an earned commission rate per above schedule."  The paragraph numbered "1" on the commission structure states "[i]n addition as a new and added feature, the salesperson will be paid an additional 1% to cover expenses on all commissionable sales."

The commission structure continues "[o]verage dollars added to any job will be split on a 40% (sales) 60% (company) basis.  All costs must be included and marked up based upon scale above prior to split."  Ex. 3.  Overage dollars refer to the amount of money left over after a salesman receives a ten percent commission on a sale that had a markup in excess of thirty percent.  Tr. 44:17-23; 382:4-8.

The commission structure does not state that marked up shipping costs are excluded when calculating a salesperson's commission, that salesperson's commissions are limited only to the sale of printed materials or sales commissions are calculated using estimated as opposed to actual costs.  Ex. 3.  Tr. at 50:4-7; 51:15-22; 53:4-11; 98:13-21.

## Alexander Was Paid Salary Plus Commissions

Alexander, when testifying about the employment memorandum, testified that he was going to receive a salary during his employment at Unimac "[b]ecause it says in A that I would get- - [i]t says in A that I would receive a draw guaranteed of 75,000 initially, and then G says after 60 days sales over draw would be paid by commission check, and I took it for its word," *Id*. at 380:9-18; Ex. A1, and that the phrase "sales over draw" in paragraph G of the memorandum meant "draw was a guarantee and then sales, anything I brought in after that would be additional." *Id*. at 380:19-23. When asked by the Court "[y]our testimony is that there is no recognized meaning to the term taking a draw?", Alexander responded: "A draw is a salary, unless it's against - - if it's against commission, then your draw becomes an advance. If it's over commission, then it's in addition to it. There's a difference between the two." *Id*. at 497:22-498:2.

Alexander's testimony is supported by a document dated February 9, 2005 and bates numbered D138 which lists his "weekly salary" at $1923.07. Ex. 24. Additionally, neither the commission payable analysis nor the document entitled "Salesman Draw" demonstrate that the amount of his weekly salary never fluctuated or changed in the months that Alexander was credited for commissionable sales. Exs. 17 and 35. In fact, in both June and July 2006 when Alexander received commission payments that exceeded the amount of his "draw", he still received his full weekly salary. Ex. 17.

## The Commission Payable Analysis

When testifying about the commission payable analysis, Ex. 17, Amann stated "I have no way of knowing if the numbers are correct, or anything like that. I just see the document." Tr. at 57:20-24. Hurley testified she recognized the document, but that it was not her document and

was created by the accounting department.  *Id*. at 322:9-17.  Since Unimac's President/CEO had

no way of knowing whether the numbers contained within the commission payable analysis were

correct and it was not Unimac's billing manager's document, it should not be afforded any

weight by the Court.

## Costs Used To Calculate Commissions At Unimac

Amann testified that Unimac does not keep records of the actual costs of producing a job,

even though the actual costs of producing a job determines how much profit Unimac makes.  *Id*.

at 96:7-13.  Amann also testified that the estimate sheet for a job "is the Bible on how a job goes

through the plant," *Id*. at 144:8-9, and that "the cost is the estimate."  Susan Hurley, Unimac's

billing manager for over twenty years[3], testified that the estimate sheet contains "all of the costs

of paper, bindery, the outside, blah, blah, and at the end it will have the total cost."  *Id*. at 358:15-

17.  Amann testified "[o]nce the estimate is completed, that's the cost establishment."  *Id*. at

262:8-9.  Susan Hurley uses the estimate sheet when calculating commissions.  *Id*. at 271:22-

272:2.

Alexander testified, when asked about his understanding or expectation as to which costs

would be used to calculate his commissions at Unimac, that it was "[t]he actual costs, of course."

*Id*. at 423:16-19.  When asked what caused him to form that belief, Alexander testified as

follows:

> The Witness:  "I think it said it in my - - in one of
> the - - it says costs, actual costs would be used.
>
> The Court:      "I'm sorry, what's 'it'?"
>
> The Witness:  "I think on the original schedule, or
> first of all, it's been a standard throughout my tenure

---

[3] April 29, 2011 Joint Pre Trial Order, page 6, section vii, paragraph 2.

> in the industry, and I believe it is in my agreement, it
> says costs will be used."
>
> The Court:       "You think it was in your agreement?"
>
> The Witness:   "I think so.  I'm not sure.  I think it was.
> I'd have to see it.  If it wasn't, it was my understanding
> for sure."

*Id*. at 423:20-424:6.

## Commission for Shipping Costs

Amann admitted during his testimony that the commission structure does not exclude

shipping for the purposes of calculating a salesman's commission.  *Id*. at 50:4-7; 188:16-20.

Amann also testified that salesmen aren't given a commission credit for shipping "[b]ecause it's

not marked up" but then admitted that the commission structure requires that "[a]ll costs have to

be marked up," and then testified that Unimac marks up shipping "on occasion."  *Id*. at 52:16-20;

52:24-53:3; 53:15-16.

When asked if he was aware whether the shipping costs on any of Plaintiff's sales were

marked up, Amann testified he was "not positive, no."  *Id*. at 187:4-7.  However, Amann also

testified certain shipping costs "get put back into the cost of the job and then get marked up when

the salesman - - when we do the commissions."  *Id*. at 186:22-23.  Amann was asked the

following:

> Q.       "Now, if the costs of shipping were marked up
> and Unimac did make a profit on it, would the
> salesman be entitled to a piece of the profit."
>
> A.       "It depends on the purpose."

*Id*. at 188:1-4.

Amann later testified that even if shipping or freight is marked up it is "[n]ot commissionable. Freight is absolutely not commissionable" but equivocates by testifying that "there are very rare exceptions based on some business attributes." *Id*. at 226:12-19.

Alexander testified that the commission structure's edict that "all costs must be included, car services, messenger, shipping, labeling, etc., and marked up" "seemed pretty standard. A lot of my clients did shipping and direct drops, and it was my practice from wherever I've been to get the outside costs or inside costs and if you had to drop ship, let's say it cost you $4, you would sell it for $5. You'd mark it up. So based on the mark up you'd get a commission." *Id*. at 388:9-20. When asked by the Court whether selling shipping was a good part of the job that, Alexander responded, "[y]es, very good. On top of printing you got to sell a second service. You got to sell distribution." *Id*. at 397:23-25.

Alexander further testified that selling shipping related to his commissions, meaning "I would get a part of it, according to the commission schedule. It would go into the bottom line of the job." *Id*. at 398:1-4. When asked by the Court what he meant by it going into the bottom line of the job, Alexander testified "Okay, when we figured commission, it was a formula that was used and it would go towards the commissionable portion, the cost versus selling price. So if there was money made on shipping, that would increase the margin or profitability of the job and I would share in more earned dollars" and that it would go into the part from which he got his 10 or whatever percent. *Id*. at 398:9-19.

### Alexander's Employment at Unimac

"Ultimately, with a little tweaking" Alexander accepted employment at Unimac when Amann agreed to increase Alexander's salary to $100,000.00 plus commissions. *Id*. at 381:10-13; Exs. 17 and 35. Alexander commenced his employment at Unimac on or about February 9,

2005.[4]  Unimac was located in New Jersey, but Alexander worked out of his home office in New York.  Tr. at 392:22-393:3.

Alexander's job title was "[e]xecutive vice president sales." _Id_. at 391:4-5; Ex.4.  Alexander testified that his duties while employed at Unimac involved more than just sales, and included "collection for money owed, writing up work orders for the production staff," which were duties Alexander testified were inconsistent with his sales duties at other entities.  Tr. at 391:6-23, Exs. 4 and 27.  Amann testified that salesmen at Unimac don't supervise production and customer service representatives but "Murray had his specific production team and his customer service person working for him."  Tr. at 36:2-4; 37:2-6.

During his employment at Unimac, Alexander sold jobs primarily to McCann and Wunderman, both of which were located in New York.  _Id_. at 393:17-22.  Alexander did not sell shipping as a component on any of his sales to McCann while at Unimac because McCann had a contract with another company for shipping.  _Id_. at 394:24-395:7.  Shipping was a component of Alexander's sales to Wunderman while he was employed at Unimac.  _Id_. at 395:23-25; Exs. 38-51 and 79-82.  Alexander, while at Unimac, marked up the cost of shipping on his sales to Wunderman by 20%.  _Id_. at 396:24-397:1; 397:16-22; Ex. 23.

## Get It Now Brochure - Job Number 236743

One of Alexander's sales while at Unimac was to McCann for the Get It Now brochure, which was job number 236743.  _Id_. at 399:14-18; Exs. 67-71.  Alexander first learned of the potential to sell McCann job 236743 in early December when Lou Arceo contacted him and said "I have a big job coming up, I'd like you to handle it, I want you to give me really, really competitive numbers.  I have to bid it out with three people, and it should be breaking pretty

---

[4] April 29, 2011 Joint Pre Trial Order, page 7, section vii, paragraph 7.

quickly." Tr. at 400:5-14.  Alexander asked Lou Arceo to email him the specs of the job and after receiving them, Alexander sent the specs to Yennie Louie for estimating and Yennie Louie provided Alexander with a cost sheet.  *Id*. at 400:15-20.  Job 236743 required production of "about 15 million" units.  *Id*. at 409:24-410:2.

After Alexander received the cost sheet he testified he,

> The Witness:   "[l]ooked it over pretty carefully, and called Lou, I think, and I said do you have any gauge of where I have to be, …, not exactly but ballpark-wise?,…,And he told me a number.  And then I went back and I called George …and I said I want you to review the estimate I got because we're not quite in line with everybody else.  And George said to me that he really wants this job and he said sometimes when I get involved or I could find another position or a better way to do it than estimating can and let me take a look at the numbers and see if I can come up with a formula, a better way to run it, I could override some of the systems that we have, maybe put it on a different press that's more cost efficient or break it up differently. So he came back and came to me with a number."

*Id*. at 400:21-401:12.

## Estimated Costs and Original Sales Price of Job 236743

While Alexander was being questioned by the Court, the following ensued:

> The Court:      "I'm sorry, was the 1.5 million the price that was to be charged - -"

> The Witness:   "McCann Ericson's final sales price, your Honor."

> The Court:      "- - when you said you had this conversation with George about how he would find a new way to do the job to get you a different number, the number you were trying to change was the number that you had gotten from the estimating department, right?"

> The Witness:   "Well, the estimating department also gave me a selling number, too.  The sheet gives you a breakdown of

14

anywhere from I think 4 through 10 percent."

The Court:      "Let's back up.  When you first went to estimating to get the cost sheet, as you put it, for the Get It Now job, they came back, there was a number on that sheet, right?  Or not?"

The Witness:  "Multiple numbers, yes."

The Court:      "There were multiple numbers.  Okay.  And the numbers were, when you say they were multiple, they were based, they said if you sell this number you get a certain percentage - -"

The Witness:  "Right."

The Court:      "Okay.  Does that sheet - -before we get to those numbers, does that sheet have a bottom line before you get to those numbers as to what estimating thinks the cost of the job is going to be to Unimac?"

The Witness:  "Yes."

The Court:      "Okay.  Do you remember what that number was for this job"

The Witness:   "I think it - - for Spanish and English combined, I think it was 800,000."

The Court:      "Okay.  And when you had the conversation with the person from McCann who gave you a hint as to how much he wanted for a number, do you remember what that number was?"

The Witness:  "He told me he wanted to be in at about 1.5, yes."

The Court:      "He said he wanted it in at 1.5?"

The Witness:  "Right."

The Court:      "Okay.  So if you stopped there and said I can do this for 1.5, would still have gotten a commission, correct?"

The Witness:   "The total - - I don't know if I'm telling it right. The total price on that sheet that he gave me was about 1.2 million."

15

> The Court:    "Not $800,000?
>
> The Witness:   "No, 800 was part of the - - there's a part.  I think the whole price to do the job was 1215 or 1219."
>
> The Court:    "On the original estimating sheet?"
>
> The Witness:   "Yes.  And I looked at it and I wanted more commission on a job that big."

*Id*. at 402:19-404:18.

### Production Time and Modification of Job 236743

Alexander testified that it took Unimac approximately two months to produce job 236743.  "The timeframe from the beginning of when we got the order to the time it was delivered was close to roughly two months but we had not received mechanicals which is the disks used to create the imaging until after the new year.  So the job really didn't start until like I guess early mid January and completed it in February" of 2006.  *Id*. at 411:19-412:5.  "Once the job came in it changed from a 28 page plus cover,…, to a 32 page plus cover."  *Id*. at 409:13-23. Alexander, who had known Lou Arceo for ten or fifteen years and had weekly lunch meetings with him during that timeframe, spoke with Lou Arceo "morning, noon and late at night, almost daily" about the production of job 236743.  *Id*. at 487:5-16.

### Actual Cost of Producing Job 236743

After Unimac was awarded job 236743, Unimac issued purchase order 511477 dated December 14, 2005 to XPEDX for "the paper used in producing the McCann Ericson brochures."  *Id*. at 417:22-418:2; Ex. 54.  Purchase order 511477 for paper was in the amount of $702,299.81 and the paper was set for delivery each day from December 27, 2005 through December 30, 2005.  Ex. 54.

Unimac issued purchase order 511620 dated January 19, 2006 to XPEDX for "the additional paper to produce the extra four pages." Tr. 418:7-11; Ex. 56. The additional paper ordered by Unimac with purchase order 511620 was scheduled for delivery on January 27, 2006 at a cost of $58,661.50. Ex. 56. Alexander testified that the amount of paper purchased by Unimac as indicated on purchase orders 511477 and 511620 were sufficient to produce job 236743. Tr. at 417:17-419:4.

Graphic Management, Inc. ("Graphic") is a print facility where the Spanish version of job 236743 was printed. Tr. at 419:9-25. The English version of job 236743 was printed at Unimac. *Id*. at 420:1-3. Alexander testified that the different versions of job 236743 were printed at different printers because:

> The Witness:  "I think my client and I had a lot to do with that.  One of the concerns we had and the job being this big is that if we ever were to mix up a brochure and intermingle part English part Spanish and have it go out to a client, that would be the last job you'd see from Verizon ever again.  So by isolating the running there was no way of getting the skid or a small portion of the job mixed in with, cause they look visually the same.  The only difference is the language.  So it would be very easy for somebody moving a skid to think they're moving the English version.  So just separate them so that can't happen."

*Id*. at 420:4-16.

Unimac issued Graphic purchase order 333893, which was dated January 23, 2006. Ex. 58. Unimac's cost for having Graphic print the Spanish version of job 236743, which included changing a yahoo logo while the job was on the press, was $52,229.60. Exs. 58 and 53. Unimac provided the ink to Graphic. Ex. 58. Amann testified that Unimac incurred $116,225.00 in overtime, which is incredible in light of Graphic being able to print the Spanish version of job

236743 for $52,229.60, less than half of Unimac's costs in "overtime" alone.  Tr. at 139:21-23; Ex. 33 (pages D34 and D35).

On January 23, 2006 Unimac issued purchase order 333898 to American Bindery Depot for 7,076,800 units of job 236743 to be bound, shrink wrapped, packed and drop shipped.  The cost to Unimac of purchase order 333898 was $226,080.25.  Exs. 61 and 53.

Unimac issued purchase order 334054 dated January 31, 2006 to E & M Bindery, Inc. for 3,577,100 units of job 236743 to be bound, shrink wrapped, packed and drop shipped.  The cost to Unimac of purchase order 334054 was $110,890.10.  Exs. 62 and 53.

Unimac issued purchase order 333949 dated January 25, 2006 to Bind Rite Services for 3,990,000 units of job 236743 to be bound, shrink wrapped, packed and drop shipped.  The cost to Unimac of purchase order 333949 was $114,037.75.  Exs. 65 and 53.

Unimac issued purchase order 334274 dated February 9, 2006 to Bind Rite Services for 266,400 units of job 236743 to be bound, shrink wrapped, packed and drop shipped.  The cost to Unimac of purchase order 333274 was $7,592.40.  Exs. 64 and 53.

Unimac issued purchase order 334354 dated February 15, 2006 to Bind Rite Services for 197,000 units of job 236743 to be bound, shrink wrapped and packed.  The cost to Unimac of purchase order 334354 was $1,182.00.  Ex. 63.

All told, the cost to Unimac for binding, shrink wrapping, packaging and drop shipping of the 15,107,300 units of job 236743 was $459,782.50.  Exs. 61-65.  Unimac spent an additional $1,037.00 transporting job 236743 (Ex. 57) and $540.00 preparing the files. Ex. 59.

An author's alteration, called "AA's", are "[t]hings that the customer requested after the original estimate, change in copy, additional copy, whatever."  Tr. at 83:10-13.  Unimac identified its total additional costs for AA's as $73,873.00.  Ex. 52.  When comparing what

Unimac claims the cost of the AA's were with the purchase orders for producing job 236743, it becomes clear that the cost of many of the AA's listed on exhibit 52 were either marked up, erroneously double counted because they were already included in a purchase order from the bindery companies, or both.  Exs. 52-54, 56-65.

For example, the AA for Saveway Transportation is listed as $1,537.00 (Ex. 52), but purchase order 334230 to Save Way Transportation clearly shows the cost to Unimac was $1,037.00.  Ex. 57.  Unimac marked up the cost of transporting job 236743 by adding an additional $500.00 to the cost of transportation.  Ex. 52.  Unimac lists as AA's the cost of "English Drops" at $49,132.00 and the cost of "Spanish Drops" as $7,100.00 (Ex. 52) but the purchase orders from the bindery companies show that the cost of drop shipping was already included by the bindery companies and should not have been counted again as an AA.  Exs. 53, 58, 61-65.  The list of AA's identified the cost of "Change Yahoo Logo While on Press" as $4,100.00 (Ex. 52) but the real cost for changing the yahoo logo was $2,000.00 and included in purchase order 333893 to Graphic.  Exs. 53 and 58.

Using the $73,873.00 amount Unimac claimed was the costs of the AA's (Ex. 52) and subtracting from that amount the mark ups and double counting of those AA's demonstrates that the real cost of the AA's to Unimac was $13,964.00 and that Unimac improperly added $59,909.00 into the cost for the AA's.  (Exs. 53, 57-65).  Production of job 236743, including AA's, cost Unimac $1,290,514.30.  Exs. 52-54, 56-65.

### Pre-Billing Meeting For Job 236743

The sales price Unimac ultimately charged to McCann for producing job 236743 changed from 1.5 million to $2,348,693 "way after the job was complete.  There was no conversation between.  They wanted the job done." *Id*. at 410:3-9.  The change in the sales price of job

236743 was discussed internally by Unimac at a pre-billing meeting after the job was complete

and delivered.  With respect to that meeting, Alexander testified at trial as follows:

>The Court:       "Follow-up question you were asked earlier.
>When these changes get made is there many discussion
>at the time about how much the client's going to be charged?
>In this case was there any discussion?"
>
>The Witness:  "No."
>
>The Court:       "So the first they learn of the higher price
>is when they get the bill?"
>
>The Witness:  "No.  No.  No.  Leaving out a big portion here.
>There was a meeting we had at Unimac, prebilling meeting."
>
>The Court:       "A meeting with whom?"
>
>The Witness:  "George Amann was there.  Keith Barriero."
>
>The Court:       "Internal people?"
>
>The Witness:  "Yes.  And, basically, they wanted to know
>what we could settle this for."
>
>The Court:       "Who is 'they' and who is 'we'?"
>
>The Witness:  "George, the internal people, George and Keith
>and Steven and Susan they wanted to know  what we can get for it."
>
>The Court:       "'We' meaning Unimac?"
>
>The Witness:  "As a company, yes."
>
>The Court:       "What price would McCann tolerate?"
>
>The Witness:  "Yes."
>
>The Court:       "And when you are talking about the price you
>are talking about for the new items?"
>
>The Witness:  "Right."
>
>The Court:       "At this point have all the new changes been

expressed?"

The Witness:   "Yes.  The job's been delivered."

The Court:      "And Verizon has just asked for it and has not demanded to know what it's going to cost them?"

The Witness:   "No.  They were extremely satisfied with the project."

The Court:      "Well, they haven't seen it yet, right?"

The Witness:   "The job has already been delivered."

The Court:      "So, they've asked - - this is part of my question.  They ask for the changes.  They don't hear anything about price.  They don't ask anything about price?"

The Witness:   "No."

The Court:      "After the whole job is over you have to make a decision about how much to charge them for the additional stuff?"

The Witness:   "Right."

The Court:      "So you had a meeting - - sorry to interrupt - - with you and George and some other people and there was a question about how much they would tolerate?  Go ahead."

The Witness:   "And in the meeting George indicated to me that, do I think I can get 1.7 million with the changes?  And I said, I don't know.  I said I'll have to make a phone call to Lou, the phone call I told you about.  And I said if I do, what would I get?  And I said I want to make the ten percent. And he told me to try and get at that point 1.7 something million dollars for the additional four pages and I said if I can get more what would happen.  He said I'll give you more. And at this point we were not working with the Exhibit 3 [commission structure].  I was sitting in a conversation in the conference room with four people and had he offered me, he said if you can get - - I called Lou and I came back and I already knew the price that I could get."

The Court:      "I'm sorry."

The Witness:   "I called Lou and said what's the maximum
I can get privately."

The Court:      "Without telling George?"

The Witness:  "That is correct."

The Court:      "What did Lou tell you?"

The Witness:  "Lou told me I could bill 2.3 something,
whatever the job actually billed for?"

*Id*. at 412:6-414:25.

Alexander did not know he could get the 2.3 million sales price until the phone call that

took place during the meeting.  *Id*. at 416:23-417:4.  Alexander went to the prearranged meeting

"[t]o secure a commission rate."  *Id*. at 432:20-25.  During cross examination, Alexander was

asked whether he had an estimate for the job by the time he attended the meeting, and he

testified:

A.      "No."

Q.      "At the time you attended that meeting, Mr. Arceo
had already received a proposal, had he not?"

A.      "On the original quantity, yes."

Q.      "Beg your pardon?"

A.      "Yes, on the original 28 pager."

Q.      "Didn't you testify that Mr. Arceo indicated that
Unimac should come in at 1.5?"

A.      "That's correct."

Q.      "Are you now saying that that did not include the
entire job?"

A.      "It didn't include the AA."

22

Q.      "It didn't include the AA?"

A.      "No."

[…]

Q.      "That $2.3 million number that he was willing to pay was for the job including the increase from 28 to 32 pages?"

A.      "Yes."

Q.      "So that when you went into the meeting and you were negotiating from 1.5 million up to 2.3 million with Mr. Arceo on the telephone, that was the complete job, including the 32 pages, correct?"

A.      "In the meeting, yes."

Q.      "Now, you're saying you went into that meeting without an estimate."

A.      "Yes.  Without a final estimate."

Q.      "How could you negotiate for a selling price to the customer without knowing what the estimate was and being able to calculate your commission?"

A.      "Well, that was exactly the point of the meeting. To find out what my commission was going to be.  That was why we called it, because there was a lot of confusion prior to that on previous jobs."

Q.      "Did you ask for an estimate at the meeting?"

A.      "Yes."

Q.      "Did you get one?"

A.      "No."

[…]

Q.      "When you got off the phone and you told Mr. Amann what had happened, that you had gotten

23

> an additional $800,000 on a job that had previously
> numbered at 1.5 million, what did you tell him?"
>
> A.      "I think I presented it as a hypothetical
> situation.  I didn't give him an indication of what I
> already knew I could get for the job."

*Id*. at 433:14-434:4; 435:19-436:15; 439:6-12.

Alexander testified that he received an offer from Amann for a commission of $267,000.00 plus 1% for expenses, which he accepted.  *Id*. at 440:8-15.  At the time Alexander accepted the $267,000.00 commission, there was no estimate present.  *Id*. at 440:16-17.  When Amann made Alexander the offer of a $267,000.00 commission, they were not working off of the commission structure.  *Id*. at 413:25-415:25.

Amann denied that a meeting dealing with the increase in Alexander's commission happened, *Id*. at 500:4-13, but Amann corroborated Alexander's testimony that the ultimate sales price for job 236743 was "fixed back in February when we sent the bill out."  *Id*. at 78:24-79:2. Job 236743 was billed out to McCann on February 17, 2006 on Unimac invoices 350257, 350258, 350259, 350260, and 350261 totaling the amount of $2,348,693.00.  Exs. 67-71.

**<u>Alexander's Post Job 236743 Meetings Trying To Collect His Commissions</u>**

Shortly after receiving a check for $44,000.00 as a commission on job 236743 Alexander received a $10,000.00 check from Amann as "a stop gap."  *Id*. at 468:16-469:5.  Alexander was asked:

> Q.      "What was at either end of the gap?"
>
> A.      "We had an agreement for a commissioned amount
> and George said he would review it and handed me that
> check and said, well, here is something and I promise I'll sit
> down and go over the numbers with you at a later date."
>
> […]

24

Q.      "And you received a check for 44,000 for the commission on the McCann job, correct?"

A.      "Yes."

Q.      "Did you have a discussion in respect to the amount with anybody at the company?"

A.      "Yes."

Q.      "Who did you discuss that amount with?"

A.      "Ms. Hurley."

Q.      "And you were not satisfied with her explanation, correct?"

A.      "She, I think word-for-word said to me, I guess this isn't what you expected and smirked.  And I ran into George's office and he was already gone."

Q.      "And did you repeat your attempt to speak to George about it?"

A.      "Repeatedly."

Q.      "And you finally did, did you not?"

A.      "I came in at least four more times for meetings which he didn't show for.  I sat in front of Ms. Peterson I think for over two hours one morning and George finally came in and he went into his office.  He says, why don't you just go to your office and I'll call you when he is ready for you.  And I went back there two hours later and he was out of the building already.  The next time we finally did get together three or four meetings later, he had the wrong job ticket pulled and I think it was at that time he handed me ten thousand.  He said, here is ten thousand in between.  I promise I'll settle this for you.  We'll get it done.  We'll go over it.  We'll sit down.  He said the job tickets are kept in a remote site and I can't get it right now.  That meeting just never occurred."

[…]

Q.      "So you are saying you only had one meeting with George?"

A.      "No.  I had more than one meeting."

Q.      "Okay."

A.      "I had zero productive meetings."

Q.      "Did you receive a $44,000 check at one of the meetings?"

A.      "I don't think.  No, I don't believe so."

[…]

Q.      "Are you saying that you received a $10,000 check at the same meeting?"

A.      "No."

Q.      "So the $10,000 check was received at a separate meeting?"

A.      "That's right."

Q.      "After that second meeting your testimony is that George said he would settle with you in the future?"

A.      "Yes."

Q.      "What was the $10,000 represented to you as being?"

A.      "A stop gap, a progress payment."

*Id*. at 469:8-12; 470:18-471:21; 472:23-473:3; 473:12-23.

Amann testified that he had two meetings with Alexander on the topic of his commission for job 236743.  *Id*. at 510:16-22.  Amann had heard through billing that Alexander was unhappy with his commission and instructed Hurley to go over it with Alexander.  *Id*. at 511:12-512:1. Amann testified that Alexander's commission was arrived at "[t]hrough our normal

26

calculations." *Id*. at 512:11-13.  However, Hurley testified that the number was arrived at in a meeting she attended with Amann and Alexander following Alexander's complaints about his commission during which Amann wrote out his calculation of Alexander's commission and "George gave him an extra percent out of goodwill." *Id*. at 308:14-25; Ex. 33 pages D34 and D35.

### Alexander's Sales to McCann

Alexander's commissionable sales to McCann during his employment at Unimac were $2,696,112.34.[5]   Alexander testified that it would be impossible for him to figure out the commissions he was entitled to on all of his commissionable sales to McCann "[b]ecause of the records given me and the way they conducted the books and accounting." *Id*. at 398:20-399-13.

### Alexander's Commissionable Sales to Wunderman

Tom Cook ("Cook") is the CFO of Wunderman and his job responsibilities include overseeing the financial operations of Wunderman.  *Id*. at 279:15-19.  Cook prepared a declaration with an attachment that listed "every check we had ever issued to Unimac."  *Id*. at 280:17-281:3; 282:8-16; Ex. 6.  Between 2005 and 2008 Wunderman paid Unimac a total of $1,105,069.34.  Ex. 6.  Cook testified "the gross total is approximately a million one and that is composed of, I think five thousand went to sales tax, 710,000 was for production materials and 390,000 was shipping charges."  Tr. at 283:1-4.  Prior to testifying, Cook reviewed "purchase orders related to Unimac" and "on every purchase order that we issued to Unimac a variant of Murray Alexander's name appeared."  *Id*. at 291:18-25; 292:14-25.

---

[5] June 24, 2011 Order, docket No. 74.

## Sales Credited And Commissions Paid to Alexander

During Alexander's employment at Unimac, he was credited with sales totaling $3,432,289.22 (Ex. 17) and was paid commissions of $54,437.06.  Exs. D1, D2, F1 and F2. Amann had no way of knowing whether the numbers contained within the commission payable analysis were correct.  Tr. at 57:20-24.

## Legal Analysis

## Assessing Credibility

"In any bench trial, the trial judge, as the finder of fact, has to evaluate the credibility of the witnesses that testify, based on the witnesses' demeanor, any previous inconsistent statements made by a witness prior to and during the witness's trial testimony, the witness's explanation for any such inconsistent statements as well as the documentary evidence in the record."  Martal Cosmetics, Ltd. v. International Beauty Exchange, Inc., et al., 2011 U.S. Dist. LEXIS 95021, at *5 (E.D.N.Y., August 23, 2011)(Melancon, J.).  The findings of fact made by the Court "are in no small part based on the trial judge's view of the credibility of the witnesses that testified, based on their trial testimony, as well as the documentary evidence and the explanation of, or reconciliation or lack thereof, of any previous inconsistent statements, written or oral, made by a witness."  Id.  Having heard George Amann testify, it is clear that his testimony is so inconsistent as to be incredible and not worthy of belief.

For instance, among Amann's inconsistent testimony was his claim that Unimac was "vindicated" after a lawsuit by former Unimac salesman Pat Bertoldo but after being challenged about his testimony Amann testified that Unimac settled the lawsuit. Id. at 206:3-7.  Amann testified that actual job costs have nothing to do with calculating Unimac's profit or taxes.  Id. at 97:1-25.

28

Another example of Amann's inconsistent testimony involved whether shipping was commissionable. Amann testified that shipping was not commissionable "[b]ecause it's not marked up," *Id.* at 52:16-20, but then testified that Unimac marks up shipping "on occasion." *Id.* at 53:15-16. And despite testifying that shipping was not commissionable because it was not marked up, Amann testified that "it depends on the purpose" whether a salesman would be entitled to a percentage of the profit from marked up shipping. *Id.* at 188:1-4. Shipping costs, according to Amann, "get put back into the cost of the job and then get marked up when the salesman - - when we do commissions," *Id.* at 186:22-23, which begs the question of why shipping costs get marked up when Unimac does the commission calculations.

An additional example of Amann's inconsistent testimony has to do with Unimac's costs of producing job 236743, Alexander's commission on job 236743 and when the final sales price of $2,348,696.00 was determined. Amann testified that when he calculated Alexander's commission on job 236743 that the cost of producing the job based upon the estimates was $1,815,749, *Id.* at 93:22-25, that there were additional costs bringing the total cost of the job to $1,970,270.50 (Ex. 12, paragraph 12) and that Alexander decided to absorb the additional $154,521.50 even though he couldn't certify where he obtained the information that Alexander agreed to absorb that cost. Tr. at 148:4-149:1. Alexander denied that he chose to absorb the cost of an AA. *Id.* at 478:4-11.

Amann, however, corroborated Alexander's testimony that the final sales price of the job "was fixed back in February when we sent the bill out." *Id.* at 78:24-79:2. If the costs to Unimac were over $1.9 million, than Unimac stood to lose close to $400,000.00 on the original sales price of $1.5 million. But since the final sales price "was fixed way back in February when we sent the bill out", there are only two logical conclusions: (1) that the original estimated costs

29

of producing job 236743 were close to the $1.2 million that Alexander testified to, *Id.* at 404:13-18, which was corroborated by the costs evidenced by the purchase orders (Exs. 54 and 56-65) and the document which itemized all of the costs of job 236743 (Ex. 53) that referenced the purchase orders; or, (2) Amann is lying about the costs of producing job 236743.

When "assessing credibility, 'we should not discard common sense and common knowledge,'" Matter of Carl W., 174 A.D.2d 678, 571 N.Y.S.2d 536, 538 (2d Dep't., 1991)(quoting People v. Garofalo, 44 A.D.2d 86, 88), and "'testimony which is incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience or self contradictory, is to be disregarded as being without evidentiary value, even though it is not contradicted by other testimony or evidence introduced in the case.'" *Id.* (internal quotations omitted).

While Amann's testimony was rife with inconsistency and unsupported by the documentary evidence, Alexander testimony was corroborated by the documentary evidence and entirely credible.

### Unimac Destroyed It's "Bible" and the Adverse Inference

"It gets back to that estimate sheet that I keep referring to.  That is the Bible…" as Amann put it.  At trial, Amann testified as follows:

> Q.    "And we don't have that sheet, do we?"
>
> A.    "It was destroyed years and years ago."
>
> Q.    "Destroyed by Unimac?"
>
> A.    "Yes."

Tr. at 144:8-13.

And so was the fate of the "Bible" for job 236743.  Job 236743 was billed out to McCann on February 17, 2006 (Exs. 67-71) and Amann knew as early as the spring of 2006 that Alexander had a problem with the calculation of his commission on job 236743.  Tr. at 94:18-21. Despite knowing that Alexander disagreed with the calculation of his commission on job 236743, Amann, while testifying about the estimate sheet for job 236743 stated "somewhere along the line it disappeared and we get rid of our documents."  *Id*. at 94:5-10.  The one document that would completely corroborate Alexander's claim for unpaid commissions by showing that the estimated costs for job 236743 were $1.2 million was "destroyed" and "disappeared" even though Amann knew Alexander challenged the calculation of his commission on job 236743 within months of job 236743 being billed out.

Generally speaking, "'when the contents of a document are relevant to an issue in a case, the trier of fact …may receive the fact of the document's…destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him.'"  Shaffer, et al. v. RWP Group, Inc., et al., 169 F.R.D. 19, 25 (E.D.N.Y., 1996)(Spatt, J.)(quoting Nation-Wide Check Corp., Inc. v. Forest Hills Distribs., Inc., 692 F.2d 214, 217 (1st Cir., 1982)(Breyer, J.).  An adverse inference "serves the dual purposes of remediation and punishment.  First, it seeks to put the non-spoliator in a position similar to where it would have been but for the destruction of evidence."  *Id*. (citing Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74 (S.D.N.Y. 1991).  The second purpose is the punitive effect; "the law, in hatred of the spoiler, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrongdoer by the very means he had so confidentially employed to perpetrate the wrong.'"  *Id*. (internal quotations and citations omitted).

Whether an adverse inference is justified is determined by two factors, the culpability of the spoliator and the prejudice accruing to the non-spoliator. _Id._ at 25-26 (citing Schmidt v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79, 81 (3d Cir., 1994); Turner, 142 F.R.D. at 74; Gates Rubber Co. v. Bando Chemical Indus., Ltd., 167 F.R.D. 90, 102 (D. Colo. 1996). The adverse inference may be drawn even if the destruction of the evidence was not willful or in bad faith. _Id._ at 26.

NYLL section 195 imposes a duty upon an employer to "establish, maintain and preserve for not less than six years contemporaneous, true, and accurate payroll records …whether paid by the hour, shift, day, week, salary, piece, commission, or other." Amann testified Unimac destroyed the estimate sheet for job 236743, which was used to calculate Alexander's commission and therefore properly classified as a payroll record, when it was "destroyed" and "thrown out" after approximately "two years." Tr. at 94:13-17. The destruction of the estimate for job 236743, in addition to violating NYLL section 195, is an extreme prejudice to Alexander as it is the only document that would corroborate his testimony that the original estimate for job 236743 was about $1.2 million and that the original sales price was $1.5 million. The estimate for job 236743 would also demonstrate that Alexander was not properly paid his earned sales commissions for job 236743 and the destruction of the evidence contained within the estimate sheet could not be considered "cumulative, insignificant, or of marginal relevance." Shaffer, 169 F.R.D. at 27. As such, the Court should take an adverse inference that the estimate sheet for job 236743 contained information harmful to Unimac, the spoliator, and credit Alexander's testimony that the original estimate was about $1.2 million with an original sales price of about $1.5 million. Tr. at 402:19-404:18.

## The Doctrine of "Contra Proferentem"

Both the employment memorandum and the commission structure were authored by Amann.  *Id*. at 25:24-26:5; 47:5-7.  The employment memorandum, at paragraph G, states "after 60 days, sales over draw will be paid by a monthly commission check."  Ex. A1 and A2.  Alexander testified that he believed "sales over draw" in paragraph G of the memorandum meant "draw was a guarantee and then sales, anything I brought in after that would be additional."  *Id*. at 380:19-23.  Alexander further testified that "[a] draw is a salary, unless it's against - - if it's against commission, then your draw becomes an advance.  If it's over commission, then it's in addition to it.  There's a difference between the two."  *Id*. at 497:22-498:2.

While requiring that all costs, including shipping, be marked up, the commission structure does not mention that shipping was non-commissionable, that the costs used in calculating commissions were the estimated as opposed to actual costs or that the commissions were limited to the sale of printed materials.  Ex. 3; Tr. at 50:4-7; 51:15-22; 53:4-11; 98:13-21.

As the employment memorandum states "sales over draw" and not "draw against commission" it is readily susceptible to more than one meaning and, therefore, it is ambiguous.  As such, it should be interpreted to mean that Alexander was to be paid a salary plus commissions, which is an interpretation supported by other documents that were received into evidence during the trial, such as exhibits 24, 35, and most importantly, the commission payable analysis that never changes or fluctuates in the months Alexander was credited with commissionable sales.  (Ex. 17).

Similarly, the commission structure's plain language does not place limitations on what items are commissionable or not, such as shipping, does not state that estimated costs were used in calculating commissions, or that commissions were limited to the sale of printed materials

33

alone.  In this instance, the plain language of the commission structure requires that Alexander be credited with commissions for shipping and it is clear that he was not.  Had Alexander been credited for selling shipping as he should have been, the sales he was credited with making would have increased by the approximately $390,000 in shipping that he sold to Wunderman.  Tr. at 283:1-4; Exs. 38-52, 79-82.  The evidence showed that Alexander marked up the shipping he sold to Wunderman, usually by twenty percent.  Tr. at 395:23-25; 396:24-397:22; Ex. 23.  The evidence also demonstrated that the markup on shipping costs to Wunderman was, at least on one job, marked up thirty-three percent.  Exs. 20 and 21.

In any event, the failure to draft a memorandum without ambiguities, to specifically exclude shipping as a commissionable component of a sale, to limit commissions to the sale of printed materials alone or to explicitly state that estimated as opposed to actual costs were used for the purposes of calculating commissions in the commission structure falls on Unimac as the drafter of both documents.  The doctrine of contra proferentem requires that both the employment memorandum and the commission structure "be construed against the drafter."  Arbeeny v. Kennedy Executive Search, Inc., 71 A.D.3d 177, 182 (1st Dep't., 2010)(citing Yudell v. Israel & Assoc., 248 A.D.2d 189 (1st Dep't., 1998).

Construing both the employment memorandum and commission structure against Unimac results in a determination that Alexander has not been paid all of his earned sales commissions in violation of the NYLL, that he was supposed to be paid commissions for his "sales over draw" and that the draw was guaranteed.  When taken in conjunction to the evidence that Alexander performed duties that amounted to more than sales by supervising production and helping Unimac collect money from Wunderman, the circumstances demonstrate that Alexander's guaranteed draw was in fact a salary.  Ex. 4, Tr. at 391:6-23.

34

When asked to explain why Unimac did not credit Alexander with any sales in the commission payable even though invoices to Wunderman showed Alexander made sales in the applicable time period, Amann responded "Murray had already left, so I think it was a moot point that any commissions go towards his name." *Id.* at 208:13-209:7.  "As a general rule, 'an at-will sales representative is entitled to post discharge commissions only if the parties' agreement expressly provided for such compensation.'" Firtell v. Update, Inc., et al., 2007 NY Slip Op 51786U at *3, 17 Misc. 3d 1101A, 851 N.Y.S.2d 57, 2007 N.Y. Misc. LEXIS 6426, 238 N.Y.L.J. 72 (Sup. Ct., New York, 2007)(quoting Swits v. New York Sys. Exch., 281 A.D.2d 833, 835 (3d Dep't., 2001).  However, an at-will employee's claims for post discharge commissions are viable "where the employee and his or her employer entered into an agreement providing for the employee to receive commissions, the agreement was silent or ambiguous as to whether the employee could obtain post-termination commissions, the agreement was drafted by the employer, and the doctrine of contra proferentem dictated that the silence of ambiguity should be construed against the drafter." *Id*. (citing Yudell v. Ann Israel & Assoc., 248 A.D.2d 189, 189-190 (1st Dep't., 1998); Kadish v. Gootkin, 10 Misc. 3d 132 (A)(App. Term, 1st Dep't., 2005).  As Amann was the drafter of both the employment memorandum and commission structure and both documents are silent with respect to post-discharge commissions, Alexander is entitled to commissions on his sales that Unimac received payment on after Alexander's discharge from Unimac.

## No Accord and Satisfaction Occurred

Accord and satisfaction is defined as: "[a]n agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance."  BLACK'S LAW DICTIONARY 13 (7th ed. 2000).  Alexander testified

that the payment to him of $10,000 was "a stop gap, a progress payment", Tr. at 473:22-23, and

that Amann promised to settle with him in the future.  *Id*. at 473:19-21.

When Amann was asked how much Uniman owed Alexander when he gave Alexander

the $10,000 check, Amann responded "I don't know.  I just was dealing with that one job.  I

didn't care what I owed him."  *Id*. at 166:11-14.  Unimac offered no evidence of the amount of

the existing indebtedness to Alexander which precipitated the alleged accord and satisfaction

with an additional $10,000 payment.  Amann testified that the commission calculation of

$140,921.00 was arrived at through Unimac's normal calculations while Hurley contradicted

Amann and testified that the commission was increased an extra percentage "out of goodwill."

*Id*. at 512:11-13; 308:14-25.

### No Evidence Alexander Ratified Commission Calculations Using Estimated Costs

The doctrine of "'ratification is the act of knowingly giving sanction or affirmance to an

act which would otherwise be unauthorized and not binding.'"  HSBC Bank U.S.A., N.A., et al.

v Adelphia Communications Corp., et al., 2009 U.S. Dist. LEXIS 10675 at *16-17 (W.D.N.Y.,

2009)(quoting 57 N.Y. Jur. 2d Estoppel, Ratification and Waiver § 87 (2007)).  Unimac has not

introduced any evidence that Alexander's conduct sanctioned or authorized that his commissions

be calculated using estimated rather than actual costs.  In fact, Alexander testified that estimated

costs were used when establishing a sales price to a customer, but actual costs were used when

calculating commissions.  Tr. at 364:16-21.  There has been no evidence introduced at trial that

Alexander was paid or credited for a commission calculated using the estimated costs of any job.

### The Doctrines of Mutual and Unilateral Mistake

Mutual mistake happens "when 'both parties to a bilateral transaction share the same

erroneous belief and their acts do not in fact accomplish their mutual intent.'"  Healy v. Rich

Products Corp., 981 F.2d 68, 73 (2d Cir., 1992)(quoting 21 N.Y. Jur. 2d Contracts § 121 (1982)).

When only one party to a transaction is in error, it is a "unilateral mistake." *Id.* (citing Seebold

v. Halmar Constr. Corp., 146 A.D.2d 886, 536 N.Y.S.2d 871, 872 (3d Dep't., 1989).  Clear and

convincing evidence is required to demonstrate that a contract should be reformed due to a

mutual mistake.  Seebold, 536 N.Y.S.2d at 872.  Reformation of a contract will not be justified

by unilateral mistake alone.  Alden Auto Parts Warehouse, Inc. v Dolphin Equip. Leasing Corp.,

682 F.2d 330, 333 (2d Cir., 1982)).

It cannot be said that there was a unilateral mistake concerning the use of estimated costs

as opposed to actual costs in the calculation of Alexander's commission on job 236743 or any

other sale.  Alexander can't be said to have unilaterally mistaken that estimated costs were to be

used when the commission structure only refers to "cost" and is silent about estimated costs

being used.

The evidence indicates that Unimac mistakenly believed Alexander knew estimated costs

were used while Alexander had no reason to know that estimated costs were used to calculate his

commission as opposed to actual costs.  Both parties were mistaken about the definition of the

"costs" that the other party used and understood and the Court may exercise its equitable powers

and reform the commission structure based upon the mutual mistake.  The evidence shows that

the increase in the sales price of job 236743 resulted in an additional $800,000.00 of pure profit

to Unimac as the additional paper to produce job 236743's AA from 28 to 32 pages was

purchased on January 19, 2006 for $58,661.50 (Ex. 56; Tr. at 418:7-11), that the costs of

producing job 236743, including the AA were $1.2 million and that the final sales price of

$2,348,696 was "fixed back in February" after the job was already delivered.  Exs. 53-54, 56-65;

Tr. at 78:24-79:2; 404:14-16; 412:6-414:25.

37

**Unimac's Failure to Pay Plaintiff His Earned Commission Wages Violated NYLL**

NYLL section 190(2) defines the word "employee" to mean "a person employed for hire by an employer in any employment."  NYLL section 190(3) defines the word "employer" to mean an individual or entity "that employs individuals in any occupation, industry, trade, business or service."  An individual whose principal activity is the "selling of goods, wares, merchandise, services,…or any article or thing" and whose earnings are "based in whole or in part on commissions" is a "commission salesman" as defined by NYLL section190(6).

An individual that solicits orders from within New York State, but is not an independent contractor, is a "sales representative" as defined by NYLL section 191-a(d).  An individual or entity that is "engaged in the business of manufacturing and who manufactured, produced, imported, distributed a product for wholesale; contracted with a sales representative to solicit orders for the product; and compensated the sales representative in whole or in part by commissions" is a "Principal" as defined by NYLL section 191-a(c).

NYLL section 190(1) defines "wages" to mean "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis."  A "commission" is defined by statute to mean "a percentage of the dollar amount of wholesale orders or sales."  *See* NYLL section 191-a(a).  An "earned commission" is statutorily defined to mean "a commission due for services or merchandise which is due according to the terms of an applicable contract or, when there is no applicable contractual provision, a commission due for merchandise which has actually been delivered to, accepted by, and paid for by the customer,…"  *See* NYLL section 191-a(b).

Alexander was an employee and Unimac was his employer as defined by NYLL.  Since Alexander's principal activity was "the selling of goods, …[or] services" and his earnings during

his employment with Unimac were "based in whole or in part on commissions", Alexander was a "commission salesman" as defined by NYLL during his employment with Unimac.

As defined by statute, "earned commissions" are "wages" under NYLL.  "[NYLL] reflects the state's 'longstanding policy against the forfeiture of earned but undistributed wages.'"  <u>Dreyfuss v. Etelecare Global Solutions-US, Inc.</u>, 2010 U.S. Dist. LEXIS 107725 at *14-15 (S.D.N.Y. September 30, 2010)(quoting <u>Markby v. Paine Webber, Inc.</u>, 169 Misc. 2d 173 (Sup. Ct. N.Y. 1996)).  "Once the commission is earned, it cannot be forfeited."  <u>Arbeeny</u>, 71 A.D.3d 177, 182 (1st Dep't., 2010).  New York's longstanding policy against the forfeiture of earned wages applies to earned, uncollected commissions as well.  <u>Id.</u> (internal citations omitted).

Whether: (1) calculating Alexander's commission on job 236743 using a cost of $1,256,252.00, as Amann did during trial, the evidence demonstrates that Alexander was entitled to a commission of approximately $449,538 plus an additional one percent, Tr. at 235:20-237:10; or, (2) using the $267,000.00 plus one percent Alexander testified he and Amann agreed upon during the pre-billing meeting when the final sales price was fixed at $2,348,693, <u>Id</u>. at 440:8-15; or, (3) adjusting for Unimac's double counting and or marking up of AA's (Exs. 52-54, 56-65); or, (4) crediting Alexander back for the $154,521.50 that Amann claimed was an additional cost that Alexander agreed to absorb (<u>Id</u>. at 148:4-149:1); or, (5) that Amann though it was a moot point to credit Alexander with any sales to Wunderman after Alexander left Unimac (<u>Id</u>. at 209:6-8); or, (6) that Unimac failed to credit Alexander with commissions for marked up shipping he sold to Wunderman, it is clear that Unimac has failed to pay Alexander all of his earned commission wages in violation of the NYLL.

## Unimac Was Unjustly Enriched At Alexander's Expense

Prevailing on a claim for unjust enrichment under New York law requires proof "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Martal, *supra*, 2011 U.S. Dist. LEXIS at *58-59 (internal citations and quotations omitted). The evidence clearly shows that when the sales price of job 236743 increased from $1.5 million to $2,348,693 Unimac obtained pure profit of approximately $800,000 and did not pay Alexander an increased commission commensurate with the increase in the sales price, requiring that restitution be paid to Alexander.

## Unimac's Is Not Entitled To A Setoff

As the Court is aware on August 10, 2010 Unimac's counterclaim seeking recovery of $93,000 from Alexander as an alleged "overdraw" of his commissions was dismissed upon Alexander's cross motion for summary judgment. The Court's decision was based upon clearly established New York law that a draw against commissions is unrecoverable in the absence of an agreement between the parties to alter that general rule, or a commission compensation policy that makes the draw recoverable. *See* Bell-Hi Company, Inc., v. Pattison Pratt, 353 N.Y.S.2d 76, 77 (1973)(internal citations omitted)(holding draw was recoverable where defendant executed a promissory note in favor of plaintiff to secure cash paid to defendant salesman as draw against commission, which altered the parties position); *see also*, Wolinetz v. Island Stationary Corp. d/b/a Office Furniture Warehouse, 2007 N.Y. Misc. LEXIS 6135*4(Third District, Suffolk County)(finding that defendant's failure to communicate policy allowing "charge backs" of commissions to plaintiff, or to establish the existence of such policy, was being advanced as a willful act of retaliation for plaintiff leaving defendant's employ and awarding plaintiff liquidated damages under NYLL § 198 (1-a)).

40

"A setoff 'constitutes a defense only in the practical sense that it operates to reduce the remedy - - rather than the debt.'"  <u>Arch Insurance Company, Lumbermens Mutual Casualty Company v. Precision Stone, Inc.</u>, 584 F.3d 33, 42, n.7 (2d Cir., 2009)(quoting <u>Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.</u>, 414 F.3d 325, 336 (2d Cir., 2005).  As a result, setoff "is 'not an affirmative defense,'" but "'more properly characterized as a permissive counterclaim.'"  <u>Id</u>. (quoting <u>Fin. One Pub. Co.</u>, at 336)(citing <u>Valley Disposal Inc. v. Cent. Vt. Solid Waste Mgmt. Dist.</u>, 113 F.3d 357, 364 (2d Cir., 1997)("Under the Federal Rules of Civil Procedure, a defendant's claim of setoff against a plaintiff is to be made by means of a counterclaim in its answer to the complaint.").

In this case Unimac's claim to a setoff was properly characterized as a counterclaim and Unimac's counterclaim was dismissed upon summary judgment.  Therefore, Unimac is not entitled to any setoff against Alexander as a matter of law.

**[INTENTIONALLY LEFT BLANK]**

## **Conclusion**

By any measure, the evidence unequivocally demonstrates that Unimac has failed to pay

Alexander his earned commission wages in violation of the NYLL and that Unimac was unjustly

enriched thereby.  Unimac is not entitled to claim a setoff.  As such, Plaintiff respectfully

requests that the Court adjudge Defendants liable to Plaintiff in an amount to be determined.

Dated: Commack, New York
     September 23, 2011

          Respectfully submitted,

          The Law Offices of Albert Adam Breud, P.L.L.C.

          By:    /s/ Albert Adam Breud, II_____
                 Albert Adam Breud, II (AB2355)
                 356 Veterans Memorial Highway
                 Suite 3
                 Commack, New York 11725
                 Telephone:   (631) 543-3030, ex.2
                 Facsimile:   (631) 543-2888
                 Breudlaw@optonline.net